FILED

2009 Mar-31  PM 03:54
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| MERCEDES-BENZ U.S. INTERNATIONAL, INC., | ] ] ] |
| Plaintiff, | ] ] |
| vs. | ]   7:08-CV-01372-LSC ] |
| COBASYS, LLC, | ] ] |
| Defendant. | ] |

MEMORANDUM OF OPINION

I.    Introduction.

The Court has for consideration Plaintiff Mercedes-Benz U.S. International, Inc.'s ("MBUSI") Motion for Preliminary Injunction filed on July 30, 2008.  (Doc. 2.)  MBUSI asks this Court to order Defendant Cobasys, LLC ("Cobasys") to specifically perform its purported contractual obligations under its agreements with MBUSI.  Cobasys also filed a Motion to Transfer Venue on August 15, 2008.[1]  (Doc. 23.)  A hearing was held on these matters on February 24-25, 2009.  If the Court were to grant the motion for a

_____

[1]For reasons discussed *infra,* this motion is due to be DENIED.

preliminary injunction, Cobasys would be ordered to begin preparations for the production of a battery for MBUSI hybrid vehicles until the Court could make a final determination on the merits.  Originally, Chevron Technology Ventures, LLC ("CTV") and Ovonic Battery Company, Inc. ("Ovonic") were also parties to this lawsuit, but have been dismissed from this action. Because MBUSI has failed to meet its burden, its motion for a preliminary injunction is due to be denied.

II.    Facts.[2]

The parties in this matter have submitted hundreds of exhibits and thousands of pages of deposition testimony in support of their respective positions.  From these submissions, the Court has constructed the following timeline of the events surrounding the alleged formation of a contract between MBUSI and Cobasys.

In December 2005, Daimler Chrysler AG ("Daimler"), General Motors ("GM") and Bavarian Motor Works ("BMW") created the Joint Sourcing Committee ("JSC") in order to facilitate the development of hybrid systems

---

[2]The facts set out in this opinion are gleaned from the parties' submissions, their respective responses to those submissions, and the Court's own examination of the evidentiary record.  These are the "facts" for preliminary injunction purposes only.

for use in each company's vehicles.  Through the JSC, Daimler developed a relationship with Cobasys.  Cobasys is a developer and supplier of hybrid technology, and is jointly owned by CTV and Ovonic.

MBUSI is an affiliate of Daimler.  Daimler acts as MBUSI's agent for the purchasing of parts to be used in vehicles manufactured by MBUSI.[3]  Daimler and MBUSI have been engaged in the development of a new hybrid vehicle for production in MBUSI's Tuscaloosa County, Alabama plant.  In 2006, Daimler issued a request for quotation ("RFQ") for the development and supply of a nickel metal hydride ("NiMH") battery pack for that vehicle. Cobasys, one of a few suppliers producing NiMH battery packs, had provided developmental services prior to the RFQ and also submitted a detailed quote in response to the RFQ.  Although Cobasys had not submitted the lowest bid, it was nevertheless selected for the project.  Daimler then entered into a developmental contract with Cobasys, and the two companies began working to develop a battery pack for use in MBUSI's new vehicle.

---

[3] Because of this relationship, Diamler and MBUSI may be read interchangeably for purposes of this opinion.

Despite having a design contract with Daimler, in the early months of 2007, Cobasys began to indicate that it would not be able to continue work on the project without a full production contract in place.  In March, Cobasys and Daimler began negotiating a production supply contract with the intention of putting that contract into place by the end of that month. The parties engaged in a number of negotiations, both over the phone and through face-to-face meetings.  These discussions culminated with a meeting in Germany where representatives from Cobasys—Erik Hansen, General Manager for Sales; Scott Lindholm, Vice President of Systems Engineering; and David Okonoski, Senior Account Manager—met with Arnika Gressmann, Hybrid Electric Vehicles Purchasing Liaison; Harald Kroeger, Electronics Platform Manager; and other senior management with Daimler. At the conclusion of this meeting, Daimler presented Cobasys with two options and asked Cobasys to offer MBUSI, in an updated quotation, one of these two options by close of business on April 2.  Cobasys decided to incorporate "proposal 1" into future quotations.  Proposal 1 incorporated the base price, warranty, shipping terms, and quantity terms that Cobasys had requested in negotiations, while obligating Cobasys to pass on any

savings in production  to Daimler rather than reducing the price of each battery up front.[4]

On April 2, Cobasys issued a revised quotation for the NiMH battery packs that included the terms of Proposal 1.  Daimler then requested Cobasys make a number of changes to this quotation.  Primarily, Daimler noted that the quotation should not have included the Cobasys Terms and Conditions.  Daimler maintained that Cobasys had expressly accepted the MBUSI Master Terms Direct Purchasing ("Master Terms") earlier in the process and requested that Cobasys conform its quotation to that document. Daimler also noted that, from its point of view, the costs quoted were not to be considered estimates, as prices and costs had a "not-to-exceed" character.

On April 5, Cobasys issued a second quotation, incorporating the changes that Daimler had requested, including express incorporation of the MBUSI Master Terms and its Appendices.  The quotation also included a ten-year warranty and delivery quantities and terms, breaking down the expected production of 5,000 units over three years.  Daimler engineering

---

[4] Proposal 2 would have reduced the base price of the battery by $300.

then asked Cobasys to ensure that the quotation met the sheet metal requirements it had earlier provided to Cobasys.  On April 13, Okonoski emailed Gressmann a list of open issues regarding shipping, sheet metal quotes, and engineering questions.  Gressmannn responded with a request that Cobasys provide an updated quotation to the Daimler team.  On April 16, Okonoski emailed to Daimler a third quotation that included edits and engineering changes.   Upon reviewing this latest quotation, Daimler discovered that the System Operating Voltage Range was unacceptable and requested that Cobasys correct that item.  Cobasys agreed to do so, and on April 17, MBUSI issued a Purchase Contract ("Purchase Contract") for the NiMH battery.  Less than thirty minutes after issuing this Purchase Contract, Gressmannn emailed Okonoski to inform him that MBUSI had not accepted certain engineering changes listed in Cobasys's last quote, citing a need to have a precise understanding of the commercial effects these changes would entail.

The Purchase Contract contained numerous errors.   The Daimler Globus system that pulls information from engineering programs and places it in the purchase contracts had included the wrong information.  As such,

the Purchase Contract listed the incorrect weight and an incorrect volume requirement of 80% as opposed to 100%. Furthermore, the price term listed in the Purchase Contract was different from the price in Cobasys's quotation.

On April 24, Okonoski called Gressmannn to inform her that he had questions about the Purchase Contract. Gressmannn asked him to submit any open questions that prevented Cobasys from signing the Purchase Contract by close of business that day.

That same day, Okonoski replied with an email stating that he had reviewed the Purchase Contract with the parties at Cobasys responsible for signing production contracts. In addition to requesting engineering and payment proposal clarifications, Okonoski also returned the Purchase Contract itself with text boxes describing points of confusion and disagreement. First, Okonoski expressed concern that the pricing term was only good through the end of 2007. He also noted that the listed weight of the battery was incorrect, and that the quantity to be provided by Cobasys was listed at 80% rather than 100%. Furthermore, Cobasys required that both maximum daily volume and the warranty terms should be stated on the

face of the Purchase Contract and that Daimler commit to return packaging to Cobasys.  Finally, Okonoski noted that the quote provided by Cobasys was not referenced in the Purchase Contract.  He requested that such a reference be made in order to document the parties' agreement. Gressmannn responded to this email with a request that Okonoski put his concerns in a letter as Daimler could not see the added text boxes. Okonoski complied with this request.

On April 27, Okonoski emailed Gressmannn with another concern. After discussing with his management the daily production allocation, Cobasys had concerns about committing to an allocation of up to twenty-five battery packs per day.  Cobasys asked if a maximum of seventeen would be acceptable.  Daimler responded that it could not reduce the requirement below twenty-five and asked Cobasys to confirm that it could meet that production schedule.  Cobasys remained firm that it would be difficult to expand production beyond seventeen batteries per day, but noted that this level of production would meet the monthly allocation provided by Gressmannn.  On May 14, Cobasys issued another quotation updating terms,

but stated that without a resolution to the daily production discussion, it would be unable to sign a Purchase Contract.

Also in late April, Cobasys began to issue purchase orders to suppliers in support of the MBUSI battery project.  Joseph Crocenzi, Vice President of Finance for Cobasys, expressed concern at this outlay of capital without a production contract in hand.  Hansen stated that Cobasys had received purchase orders and supporting documentation from Daimler that allowed it to move ahead while covering costs in case the program was cancelled. Hansen noted that the program had always been projected to lose money, but was necessary to enter into business with Daimler and BMW.

On June 26, Gressmannn emailed Okonoski noting that she understood that Cobasys's board needed to approve the Purchase Contract and asking when it would next meet to review that document.  The same day, Okonoski sent a letter to Gressmannn stating that the Board of Directors and Cobasys management had reviewed the Purchase Contract, and upon confirmation of its understanding of the agreement, the Board would approve and sign the contract.  The letter contained a number of clarifications, including a

daily maximum production figure of seventeen, a piece price figure divided into base price and nickel content, and warranty information.

On July 10, the JSC met with Cobasys to discuss the status of the production relationship with Cobasys.  It was noted at this meeting that Cobasys was eleven weeks overdue on signing the Purchase Contract and that its overall behavior during the Daimler final negotiations did not support its intention to enter into a long-term relationship.  The meeting also contained discussions of the terms Cobasys expected to see on a purchase contract before it could sign.

On July 24, Gressmannn emailed Cobasys an explanatory letter regarding the concerns expressed by Cobasys at the July 10 meeting.   The letter began by noting that since Cobasys had confirmed an ability to produce seventeen units per day, MBUSI was willing to place the Purchase Contract with the company.  The letter went on to explain that the MBUSI Purchase Contract, not the supplier's quotation, formed the basis of the contract between the supplier and MBUSI as that document is the only one requiring the signature of both parties.  Further, it stated that MBUSI would agree to buy the components by signature and Cobasys would agree to

supply the components by signature.  Gressmannn then proposed adding certain language to the Purchase Contract to address Cobasys's concerns about warranty and various engineering specifications.  Finally, Gressmann agreed to split the piece price into a base component and a nickel content quotation.  Gressmannn asked that Cobasys confirm that its concerns were alleviated by July 26, noting that the Daimler representative authorized to sign the amended Purchase Contract would be out of the office after that date.   Following two more clarifying emails between Okonoski and Gressmannn, Okonoski indicated that he felt that the proposed agreement was consistent with what the Cobasys Board of Directors expected, and promised to present it for their approval.  On August 15, Gressmannn emailed to Okonoski the two Purchase Contract amendments and asked that Cobasys sign all three documents and return them to her.

On September 9, Ivan Menjak, General Manager for Planning and Business Strategy, submitted to the Cobasys Management Committee the production contract proposal made by Daimler.  It was recommended that the Management Committee favorably consider the production contract

provided it was willing to make a long-term commitment to the business. It was also noted that Daimler requested a response by September 30.

On September 27, the Cobasys Management Committee rejected the proposed Purchase Contract.  Daimler, noting the importance of the battery to future vehicle development, continued to work into 2008 to secure an agreement from Cobasys to produce the batteries.  In June 2008, MBUSI sent a letter to Cobasys claiming that a production contract existed between the two parties and requesting Cobasys provide adequate assurance of timely performance and delivery of the NiMH battery.  On July 9, Cobasys responded, maintaining that while developmental work continued, Cobasys felt it had no production contract with MBUSI.  On July 30, MBUSI filed the instant lawsuit for Breach of Contract, seeking to compel Cobasys to produce the batteries.

III.   Standard.

Before a district court may issue a preliminary injunction, the burden is on the moving party to demonstrate (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs

whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) ("These four considerations are factors to be balanced, not prerequisites that must be met.") (citations omitted).   A preliminary injunction is an "extraordinary and drastic remedy."  *Siegel*, 234 F.3d at 1176.  Typically, a preliminary injunction is "prohibitory and generally seeks only to maintain the status quo pending a trial on the merits."  *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).   When a preliminary injunction goes beyond the status quo and seeks to force one party to act, it becomes a mandatory or affirmative injunction and the burden placed on the moving party is increased.  *See Exhibitors Poster Exchange, Inc. v. Nat'l Screen Service Corp.*, 441 F.2d 560, 561 (5th Cir. 1971)[5] ("[W]hen a plaintiff applies for a mandatory preliminary injunction, such relief 'should not be granted except in rare instances in which the facts

---

[5] Under *Bonner v. City of Prichard*, decisions handed down by the old Fifth Circuit before October 1, 1981 are binding in the Eleventh Circuit, unless subsequently overruled.   661 F.2d 1206, 1209 (11th Cir. 1981).

and law are clearly in favor of the moving party.'") (quoting *Miami Beach Federal Sav. & Loan Ass'n. v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958)); *Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) ("Only in rare instances is the issuance of a mandatory preliminary injunction proper."); *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.").

IV.   Analysis.

A.   Likelihood of Success.

Given the high bar for granting a mandatory preliminary injunction, MBUSI must show that when the governing law of the contract is applied to the facts, the weight of the evidence clearly shows the existence and enforceability of its contract with Cobasys.  The Court must first determine what law to apply.

The Master Terms contain a choice-of-law provision that states, "This Agreement and all questions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws

of the State of Alabama as if entirely performed therein and without giving effect to its conflict of law rules." (Doc. 54, Ex. 8, p. 12, § 28.1.)[6] In Alabama, the "right of parties to an agreement to choose a particular state's laws to govern an agreement" is well-settled, so long as choice-of-law provisions are not contrary to Alabama law or public policy. *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506 (Ala. 1991); *Craig v. Bemis Co.*, 517 F.2d 677, 680 (5th Cir. 1975). Nothing in the choice-of-law provision contained in the Master Terms is contrary to law or public policy. Cobasys maintains, however, that it never agreed to the Master Terms and by extension the choice-of-law provision.

According to MBUSI, the Master Terms were included as a part of the initial RFQ issued by Daimler. *See* Gressmann Depo., 351:9-13. Parties submitting quotations to Daimler were asked to express their assent to the statement, "I have read and agreed to the Daimler Chrysler terms and conditions." *Id.* at 351:2-8. While suppliers were not required to assent to

---

[6]For the purposes of this opinion, the Court will refer to exhibits submitted with the parties briefs according to their party designations, e.g., Doc. 54-13 as Doc. 54, Ex. 3. The Court will refer to page numbers as designated when the document was filed, with the exception of all exhibits submitted during oral argument and deposition transcripts, which will be referred to by their internal page numbering.

the Master Terms in order to submit a quotation, Cobasys apparently did. *Id.* at 351:20-352:6; Doc. 54, Ex. 7.

According to the Appendices of the Master Terms, "Supplier" is "[t]he legal entity which has signed the Agreement [defined earlier as the Master Terms] in the signature block designated 'Supplier.'" (Doc. 54, Ex. 9, p. 8, § 27.)  No one from Cobasys physically signed a copy of the Master Terms, but under Alabama law, electronic assent as part of the RFQ process has the same effect as a physical signature.  *See, e.g.,* ALA. CODE § 8-1A-7 (indicating electronic records and signatures have the same effect as paper ones).[7]

While no one disputes that Cobasys electronically agreed to some form of standard terms, Cobasys argues that this electronic assent is irrelevant, as it agreed to the Daimler Chrysler Terms & Conditions, not the Master Terms.  In support of this argument, Cobasys points to the confirmation sheet provided for Daimler which records that Cobasys agreed to the "Daimler Chrysler Terms & Conditions."  (Doc. 54, Ex. 7.)  The document

---

[7] Cobasys has argued that if the Master Terms were never effective, venue is more proper in Michigan and Michigan law should apply.  In determining the effectiveness of the Master Terms, the Court notes that Michigan law gives the same effect as Alabama law to electronic and written signatures.  MCL 450.837.

entitled "Daimler Chrysler Terms & Conditions" is distinct from the Master Terms.  *See* Gressmann Depo., 231:19-232:7.  Cobasys claims that it was aware of this distinction because it had worked under the Daimler Chrysler Terms & Conditions as part of the developmental contract with MBUSI. (Doc. 51, Ex. 15.)

However, in order to find that the alleged production contract was governed by these terms and not the Master Terms, this Court would be required to ignore the fact that Cobasys received the Master Terms as part of the RFQ and repeatedly expressed its assent to those terms in the event that a production contract was formed.  Cobasys's initial quotation refers to the Master Terms.  *See* Doc. 54, Ex. 6, p. 22.  In his deposition, Okonoski identified the Master Terms as the terms that he received, reviewed, and to which he agreed.  Okonoski Depo., 105:22-106:3.  Finally, Cobasys's April 2, 2007 Quotation incorrectly referenced the Cobasys Terms & Conditions as controlling.  *See* Doc 54, Ex. 4, p. 11-12.  Gressmann immediately responded, noting Cobasys's agreement to the Master Terms and asking for the removal of its own Terms & Conditions.  Cobasys did so, apparently

without complaint, and its April 5, 2007 Quotation referenced the Master Terms and its Appendices.  (Doc. 54, Ex. 10, p. 11-13.)

The Court is satisfied that Cobasys did agree to be bound by the Master Terms.[8]  It would be bizarre indeed, recognizing that Cobasys did receive and review a copy of the Master Terms, to find that Cobasys was bound by another set of terms altogether, particularly when its acceptance of the Master Terms was reiterated on numerous occasions.  Therefore, since the parties agreed to be bound by Alabama law, the Court will look to that law to determine the likelihood that a contract was formed between the parties.[9]  *See Vacold LLC v. Cerami,* 545 F.3d 114, 123-24 (2d Cir. 2008) (discussing how preliminary agreements can create binding obligations on the parties, even if the ultimate contractual objective is never achieved).

---

[8] Cobasys, despite arguments to the contrary at the February 24-25, 2009 hearing, apparently agrees, noting in its brief that, "While there is no dispute that the parties intended for the Master Terms to govern *in the event* a production contract [was] entered into by the parties, the Master Terms itself does not and cannot bind a supplier to an unknown contract."  (Doc. 59, p. 6.)

[9] Since the Court is satisfied that Cobasys agreed to the Master Terms, Cobasys is also bound to the valid forum selection clause contained therein.  Therefore, the motion for change of venue is denied as it applies to the motion for a preliminary injunction.

Alabama courts are clear that "whether parties have entered a contract is determined by reference to the reasonable meaning of the parties' external and objective actions." *Cook's Pest Control, Inc. v. Rebar*, 852 So. 2d 730, 738 (Ala. 2002) (citations omitted); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kilgore*, 751 So. 2d 8, 11 (Ala. 1999) ("Conduct of one party to a contract from which the other may reasonably draw an inference of assent to an agreement is effective as acceptance."); *Deeco, Inc. v. 3-M Co.*, 435 So. 2d 1260, 1262 (Ala. 1983) ("The existence *vel non* of a contract is determined by reference to the reasonable meaning of the parties' external and objective manifestations of mutual assent.").  While a contract may exist without a final comprehensive document in place, the parties must nevertheless agree on the material terms of the contract.  This agreement may consist of "several communications between the parties, some in writing and some oral, each constituting a link in the chain which comprises the entire contract."  *Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297, 304 (Ala. 1986).

The general consensus of Alabama courts regarding contracts is consistent with the Uniform Commercial Code ("U.C.C.").  Under the

U.C.C., "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." ALA. CODE § 7-2-204(1).  This flexibility allows for contracts, even if the exact moment of creation is unclear and even if one or more terms are left open, so long as the circumstances indicate with reasonable certainty that the parties intended to a create a contract.  *Id.* at (2).

Both parties have applied the thoroughly documented and relatively undisputed facts to their respective theories of the case.  For its part, MBUSI points to several different dates any of which it maintains a contract came into effect.  Cobasys, on the other hand, argues that no contract was ever effectuated.

### 1.  Master Terms Theory.

MBUSI's primary contract theory relies on a formalistic contracting argument in which the two parties engaged in lengthy negotiations culminating in an offer by Cobasys and an acceptance by MBUSI.  This theory rests on Cobasys's initial agreement to MBUSI's Master Terms and MBUSI's

subsequent acceptance of Cobasys's final quotation through the issuance of the Purchase Contract.

MBUSI purports that the Master Terms governs how a contractual relationship is formed between MBUSI and a supplier.  While suppliers may agree to be bound by the Master Terms in response to a RFQ, the Master Terms itself only comes into effect by the occurrence of certain events. Section 18.1 of the Master Terms reads, "This Agreement[10] shall enter into force on the earliest date of the following events to occur: (a) issuance by MBUSI of a Letter of Intent to source the Product with the Supplier; (b) issuance by MBUSI of the Minutes of Final Negotiation of the prices; (c) issuance of any Purchase Order for tooling and/or for any Product, Exchange Product, or service part; and, (d) signing by both Parties to this Agreement." (Doc. 54, Ex. 8, p. 9.)  In this case, MBUSI maintains that the issuance of a purchase order following the agreement of the parties—event (c)—created a contract between MBUSI and Cobasys and brought the Master Terms into effect.  Kroeger Depo., 97:7-12 ("The accept — acceptance of the Master

---

[10] Agreement is defined in the Appendices as "the Master Terms Direct Purchasing into which these Appendices are incorporated."  (Doc. 54, Ex. 9, p. 6, § 1.)

Terms, the quote and the sending — after the final agreement with the pricing and everything sending out the purchase order, that's the process that sets the supplier.") This interpretation by MBUSI concurs with the Master Terms definition of Contract Documents.

> Section 2 of the Appendix:  Definitions defines Contract Documents as:
>
> The written documents which govern the contractual relationship between MBUSI and Supplier, which include (a) Special Terms, if any; (b) the Agreement, excluding all Appendices, (c) all Appendices to the Agreement; and (d) General Terms, which shall be considered an integral part of any Purchase Order issued by MBUSI.  In case of inconsistencies, the Contract Documents shall prevail over each other in the priority listed in the preceding sentence of this paragraph.

(Doc. 54, Ex. 9, p. 6, § 2.)

This definition itself contains a number of defined terms. Special Terms are defined as, "Terms and conditions which modify or add to the General Terms of a Purchase Order issued under the Agreement, provided that the additional or modified terms and conditions are reduced to writing and signed by MBUSI." *Id.* at 8, § 25.  General Terms are defined as, "The general terms and conditions of purchase for goods, which shall be considered an integrated part of any Purchase Order issued by MBUSI under

the Agreement." *Id.* at 6, § 8.  Finally, a Purchase Order is defined as, "An order for the supply of specific Product, Exchange Products, service parts, or other goods or services issued by MBUSI to Supplier pursuant to the Agreement, which may be in printed form mailed to Supplier, or, at the discretion of MBUSI, by telecopier, or by means of the MBUSI electronic data interchange system."[11]  *Id.* at 8, § 23.

According to the Purchase Order Procedures section of the Appendices of the Master Terms, "The purchase of Product, Exchange Products, or service parts shall be made pursuant to the Agreement by issuance by MBUSI to Supplier of Purchase Orders, in forms, adopted by MBUSI from time to time for such purpose."  *Id.* at 47, § 1.  These Purchase Orders incorporate the Contract Documents, as defined above, and these documents control the relationship between the contracting parties.  *See id.*  The Master Terms requires that the supplier then "conclude with MBUSI, in due time, the Purchase Orders" issued by MBUSI pursuant to the agreement.  (Doc. 54, Ex.

---

[11] Cobasys makes a great deal of the distinction between a "Purchase Order" and a "Purchase Contract."  MBUSI uses the terms interchangeably.  The Purchase Order definition makes it clear, however, that the Master Terms are broad enough to include the eventually issued document, whatever its title.

8, p. 4, § 2.2.)  The method by which the supplier concludes the purchase order is defined in Purchase Order Procedures as either express acceptance or performance.  *See* Doc. 54, Ex. 9, p. 47, § 2.

As to quantity and price, the Master Terms addresses both.  Section 4.1 requires MBUSI to "advise the Supplier in due time regarding its volume plans for the Product."  (Doc. 54, Ex. 8, p. 6, § 4.1.)  Section 7.1 addresses price, stating, "The price(s) for the Product, Exchange Products, and/or services parts supplied to MBUSI shall be based upon the agreed price(s) in the respective Purchase Orders issued under this Agreement . . . ."  *Id.* at 7, § 7.1.  Price is further explained in the Price Adjustment section of the Appendices.  There, the Master Terms explains that the "prices for the Product, Exchange Product, and service parts shall be fixed and firm throughout the term of this Agreement."  (Doc. 54, Ex. 9, p. 41, § 1.)  This description is not as rigid as it might first seem.  While the price in the Purchase Orders may reflect the final negotiated price, the Master Terms allows for adjustments to the price based on annual improvements in productivity as well as design changes initiated by either MBUSI or the supplier.  *See id.* at § 2.

Based on this understanding of the Master Terms, one can imagine how a generic contract between MBUSI and a supplier would come to be.  MBUSI would issue a RFQ, seeking a supplier to provide some required component. A supplier would then provide a quotation in response.  In that quotation, the supplier would agree to the Master Terms.  Depending on the specificity of the RFQ and quotation as to material terms of the contract—price and quantity for instance—MBUSI might be able to immediately issue a purchase order establishing the contract.  That contract would then be governed by its express terms, the Master Terms, and the underlying terms of agreement, which are automatically incorporated into the Purchase Orders. *See* Gressmann Depo., 142:4-15.

If the quotation were not immediately accepted, MBUSI and the supplier would engage in further negotiations until the material terms were finalized.  Then a purchase order would issue consistent with the agreed upon terms.  Of course, the status of the relationship would not be static. It is understandable that in any complex transaction, as development and production continues, modifications will be necessary.  To a large extent, the effects of those modifications, both as to price and production, will be

determined by mechanisms set out in the governing documents.  To the extent those documents do not suffice, a side agreement between the parties might be required.  *See* Doc. 54, Ex. 8, p. 14, § 34.1 ("Except as otherwise permitted by this Agreement, no provision of this Agreement may be changed or modified except by agreement in writing signed by both parties.").

Understanding this contractual framework is necessary to appreciate the events that transpired between August 2006 and September 2007. Cobasys first accepted the Master Terms when it responded to the 2006 RFQ. Cobasys's original quote included an initial pricing between $3,315 and $2,812 per unit depending on volume. (Doc. 54, Ex. 6, p. 5.)  The quotation also incorporated a ten-year warranty.  The quotation provided by Cobasys also set out a detailed discussion of prototype requirements, production builds, and cost breakdowns.  It also stated that payment terms would be governed by "Mercedes-Benz U.S. International, Inc. Direct Purchasing terms."  *Id.* at 22.  These terms then governed the relationship between the two parties, including how and when a contract would be consummated. While the selection of Cobasys by MBUSI did not establish a contract, it did

indicate a firm intention to do so.[12]  *See Vacold LLC*, 545 F.3d at 124 ("[Preliminary agreements] do not commit the parties to their ultimate contractual objective.  Rather, they bind the parties to the obligation to negotiate the open issues in good faith in an attempt to reach . . . [an] objective within the agreed framework.") (citations omitted).

It is undisputed between the parties that developmental work began following the selection of Cobasys, and negotiations ensued to formulate a production contract between the two parties.  On January 19, 2007, Okonoski emailed the Cobasys team to express the "Good News!" that the design for the battery was frozen and that Cobasys would be submitting a "final quote . . . prior to contract signing."  (Doc. 54, Ex. 26.)

On March 9, 2007, Cobasys and MBUSI conducted a telephone conference in which Cobasys expressed its strong desire to have a production contract in place by the end of March.  This conference resulted in face-to-face negotiations in Germany that culminated in MBUSI asking Cobasys to select from two proposals.  MBUSI did not indicate that it would

---

[12]The Master Terms state that MBUSI "intends to purchase from Supplier 100% of the demand requirements for the Product . . . ."  (Doc. 54, Ex. 8, p. 4, § 2.1.)

issue a purchase order and thus form an agreement in response to Cobasys's

selection of one of these options.  Instead, it directed that Cobasys issue an

updated quotation "that reflected Cobasys' [sic] decision on the two options

provided by Mr. Kroeger."  (Doc. 54, Ex. 4, p. 1.)

Cobasys eventually selected the first option.  In a March 29, 2007

email, Hansen stated that before he could respond with a "firm

commitment" he needed to clarify his understanding of "proposal 1" to

MBUSI's Kroeger, stating,

> Proposal 1 was that [MBUSI] sign the contract as is today.  You
> would accept [Cobasys's] piece price, development costs and
> warranty as stated.   No additional cost changes would be
> acceptable other than those driven by engineering decisions and
> those would be handled under change control.  Any cost savings
> that can be generated through engineering changes or supplier
> cost downs would be passed on to Daimler Chrysler.

(Doc. 54, Ex. 3, p. 3.)

Cobasys chose this proposal.  In a March 31, 2007 email, Hansen wrote,

"By choosing what we consider a fair proposal to accept the contract 'as is'

(proposal 1), we certainly do not wish, nor do we understand why our good

relationship with DCX to this point should be negatively affected."  (Doc. 54,

Ex. 3, p. 1.)

On April 2, 2007, Okonoski submitted a revised quotation reflecting Cobasys's selection of the terms of proposal 1, including warranty, price, quantity, and delivery terms.  (Doc. 54, Ex. 4, p. 11, 16, 20.)   In the following weeks, Gressmann did not accept the quotation but instead provided Okonoski with a number of points of disagreement with Cobasys's quotation.  These included failure to refer to the MBUSI Master Terms, questions regarding sheet metal requirements, shipping terms, and voltage requirements.  *See* Doc. 54, Ex. 10; Doc. 51, Exs. 17, 48; Doc. 59, Exs. 81-84.  The Cobasys quotation was continuously updated to address these concerns.  *See* Doc. 51, Ex. 17; Doc. 59, Ex. 85.  Following a correction to MBUSI's final concern—voltage requirements—on April 17, 2007, a Purchase Contract was issued by MBUSI.  (Doc. 54, Ex. 11.)  It is MBUSI's contention that, at the moment the Purchase Contract issued, MBUSI and Cobasys were bound to perform their respective duties under the agreement.  *See* Gressmann Depo., 369:14-19 ("For my understanding, at that point in time, the award was placed in the form of a purchase order by Cobasys on April 17th and with that award having taken place on April 17th, both MBUSI and the supplier were bound to the Master Terms in the purchase order.").

Under this framework, the available evidence offers a strong argument for the existence of a contract.  The parties agreed to a set of Master Terms that would define their relationship, and the Master Terms is clearly called out in both Cobasys's Quotation and MBUSI's issued Purchase Contract. They conducted developmental work on the product at issue while engaging in lengthy negotiations to finalize a production contract.  On March 31, 2007, the parties appeared to determine the price, warranty, quantity, and delivery terms that would be included in Cobasys's revised quotations to MBUSI.  For the sixteen days that followed, the parties engaged in further negotiations about the other terms of a possible agreement.  These negotiations culminated with an offer by Cobasys that begins, "Cobasys is pleased to offer . . ." and included language indicating that the offer was "good for (30) days."  (Doc. 51, Ex. 17, p. 9, 24.)  In response to this offer, MBUSI issued a signed Purchase Contract.  (Doc. 54, Ex. 11.)  Based on this evidence, it could be argued that a contract was formed.

But this level of persuasion is not sufficient.  The burden under the affirmative injunction standard is high, and MBUSI must be able to show that this matter is one of those "rare instances in which the facts and law are

clearly in favor of the moving party." *Exhibitors Poster Exchange, Inc.*, 441 F.2d at 561.  There are a number of incongruities and inconsistencies born of confusion between the parties and the shifting fortunes of Cobasys which cast enough doubt on the existence of a contract to prevent MBUSI from meeting the likelihood of success standard.

For instance, important aspects of the contractual agreement between Cobasys and MBUSI are not correctly reflected in the Purchase Contract, and it is the "reasonable meaning of the parties' external and objective actions," rather than what they intended to say, that governs the question of mutual assent.  *Cooks Pest Control*, 852 So.2d at 738.  As an example, the Purchase Contract lists the rate quantity as 80%, rather than the 100% agreed to by the parties.  Standard MBUSI practice is to commit to buying only 80% of a product from a supplier.  *See* Gressmann Depo., 201:7-203:6. Therefore, the MBUSI system that generated the Purchase Contract included the standard 80% term, language that apparently cannot be changed, no matter what the actual agreement of the parties.  *Id.*  MBUSI contends that the understanding of the parties was that Cobasys would supply 100% of the volume requirements of the hybrid project, and that this understanding

governed the contract regardless of the content of the Purchase Contract.

*Id.*  This contention is supported by Alabama Commercial Code Section

7-2-207 which states,

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

Section 2-207 was intended "to alter the 'mirror' rule of common law,

requiring the terms of the offer and acceptance to be identical, or to mirror

each other."  *Burbic Contr. Co., Inc. v. Cement Asbestos Products Co.*, 409

So. 2d 1, 4 (Ala. 1982).  This section recognizes that in commercial settings,

the terms of the offer and acceptance will rarely be identical.   Under

Section 2-207(1), a contract can be found to exist even if the acceptance

contains terms "additional to or different terms from those offered or

agreed upon,  unless acceptance is expressly made conditional on assent to

the additional or different terms."  ALA. CODE § 7-2-207(1).  Finally, neither

a mistake nor an omission will undo a contract in which an agreement has

been reached on the material terms.  *See* ALA. CODE § 7-2-201 (1) ("A writing

is not insufficient because it omits or incorrectly states a term agreed upon

. . . .")

However, given the complex contractual framework under which the parties agreed to work, it remains an open question whether the Master Terms contracts around this default rule.  The Master Terms appears to limit the degree to which underlying negotiations can govern an agreement between MBUSI and Cobasys in the face of written documents.  As discussed above, the Contract Documents section of the Master Terms Appendices does incorporate the General Terms of the agreement into each issued purchase contract.  (Doc. 54, Ex. 9, p. 6, § 2.)  But Special Terms take precedence over all other contractual documents, including the Master Terms itself.  *Id.*  Since the Special Terms are defined as those terms that "modify or add to the General Terms of a Purchase Order issued under the Agreement, provided that the additional or modified terms and conditions are reduced to writing and signed by MBUSI," any terms listed on the Purchase Contract that varied from those of the supplier's quotation would therefore take precedence over that quotation.  *Id.* at 8, § 25.  Under this interpretation, the quantity term would remain open at the point the

Purchase Contract was issued since Cobasys had never agreed to an 80% quantity term, thus allowing for the possibility of the ultimate conclusion that no contract was formed on April 17, 2007.

The April 17, 2007 date is important for MBUSI's theory that a contract was formed pursuant to the Master Terms. Prior to April 17, 2007, it is evident that the Cobasys negotiating team could enter into production contracts. Under Alabama law, "An agent's authority to contract on behalf of his principal must be either expressed, implied, or apparent." *Lawler Mobile Homes, Inc.*, 492 So. 2d at 304. Cobasys has produced no documentation indicating that the high ranking Cobasys officials involved in negotiations with MBUSI were not authorized to enter into binding agreements when the Purchase Contract was issued. Gressmann testified that she was not aware of any limitation on the Cobasys teams' ability to enter into contracts at the time of the final negotiations in Germany in March 2007. Gressmann Depo., 208:23-209:9. Perhaps more importantly, the positions held by these officials along with their conduct towards MBUSI are more than sufficient to constitute apparent authority to enter into these agreements. *See Buchanan v. Collier,* 555 So. 2d 134, 136 (Ala. 1989)

("Apparent authority of an agent arises from the acts of the principal, either by omission or commission, and such authority is implied where the principal passively permits the agent to have the authority to act on his behalf."). Hansen, Lindholm, and Okonoski were sent to Germany to conduct final negotiations with MBUSI representatives on such issues as price, warranty, quantity, and shipping terms. Okonoski Depo., 40:5-14. Hansen, the General Manager for Sales, accepted the proposal on those terms in an email on March 31, 2007. (Doc. 54, Ex. 3, p. 1.) Its quotations to MBUSI began, "Cobasys is pleased to offer this proposal...." (Doc. 51, Ex. 17, p. 9.) Given the circumstances, such a document obviously would lead MBUSI to believe that whoever submitted it was authorized to do so.

Beyond April 17, 2007, however, the volatile situation within Cobasys began to manifest itself in the negotiations between the two parties. Cobasys's representatives began intimating that they were not in a position to commit the company to long-term deals as early as April 24, 2007. (Doc. 51, Ex. 22, p. 3.) By May 26, 2007, Cobasys had informed MBUSI that board approval was required before the Purchase Contract could be signed. *See* Doc. 51, Ex. 24; Flanders Depo., 68:1-70:6 (discussing the suspension of Tom

Neslage's authority to enter into long-term commitments in May 2007).  It is not unreasonable to conclude that by the time MBUSI had sufficiently corrected the confusion caused by errors in the Purchase Contract, the Cobasys team was no longer able to contract with MBUSI without the approval of the Board.

Finally, there is the contentious dispute over whether an agreement could be consummated between the parties without the signature of Cobasys on the Purchase Contract.  Cobasys claims it could not.  MBUSI contends that signing purchase contracts is merely a procedural tool designed to ensure that these contracts accurately reflect the parties' existing agreements.  Gressmann Depo, 123:1-8.

The law, in many ways, is with MBUSI.  It is not necessary for a contract to be signed in order for it to be enforceable.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kilgore*, 751 So. 2d 8, 11 (Ala. 1999) ("The object of a signature on a contract is to show mutuality and assent, and that mutuality and assent can be manifested in ways other than a signature."). "Provided [a contract] is accepted and acted upon," a signature becomes an unneeded, if still prudent, formality.  *See Lawler Mobile Homes, Inc.*, 492

So. 2d at 304.  However, while it is well-settled that a signature is not necessary for the formation of a contract, "an unsigned contract cannot be enforced by either of the parties, however completely it may express their mutual agreement, if it was also agreed that the contract should not be binding until signed by both of them." *Hunter v. Wilshire Credit Corp.*, 927 So. 2d 810, 813-14 (Ala. 2005) (citing *Paterson & Edey Lumber Co. v. Carolina-Portland*, 112 So. 245, 249 (Ala. 1927)).

Cobasys points to a number of documents and emails produced by MBUSI throughout the Spring and Summer of 2007 that it believes indicate that no contract could be formed without the signature of both parties. *See, e.g.,* Doc. 51, Exs. 38-47.[13]  Cobasys also offers this evidence as an admission by MBUSI that no contract was formed on April 17, 2007, or any other date.  However, MBUSI's interpretation is more plausible; it expected Cobasys to sign the Purchase Contract confirmation sheet because it felt such a signature was part of its contractual duty under the now effective Master Terms.  Kroeger Depo., 99:1-9.

---

[13] MBUSI correctly argues that these documents are all dated after April 17, 2007, and cannot be used to undo such an agreement if it had already come into existence.

But once again, plausibility is not the test.  As the party asking for the extraordinary remedy of an affirmative injunction, MBUSI needed to be able to show that the existence of the agreement is clear from "the facts and law."  *Exhibitors Poster Exchange, Inc.*, 441 F.2d at 561.  It is difficult, for instance, to ignore a July 24, 2007 email from Gressmann that states, "The MBUSI Purchase Contract alone, not the suppliers' quotation, represents the contractual basis between supplier and MBUSI, as it is the only document which is signed by both parties.  MBUSI is the party making the offer to buy specific components from the supplier by signature.  The supplier is the party to agree to that buying offer by signature."  Doc. 51, Ex. 20, p. 6.  Read in a light most favorable to Cobasys, this statement would seem to limit the means by which a contract can be formed to signature by both parties.  While this statement was made well after the issuance of the Purchase Contract, it supports an interpretation of language in the Purchase Contract itself that seems to require a signature to bind Cobasys to an agreement.  *See* Doc. 51, Ex. 18, p. 5 (stating "We, Cobasys . . . supply and you, Mercedes Benz International Inc., . . . purchase . . . ."  followed by a signature block asking for "Place, Date Signature of supplier").  Because of

these inconsistences, even though the Court believes a signature was not ultimately required, it cannot sustain that conclusion with the level of certainty necessary to grant an affirmative injunction.

       2.  Totality of the Circumstances Contract Theory.

In the alternative, MBUSI argues that the totality of the circumstances establishes an agreement between the two parties, even if the precise moment of agreement is undefined.  This theory is outside of the aegis of the Master Terms and focuses on the activities in March 2007.   In March, Cobasys was eager to enter into a contract by no later than the end of that month.  (Doc. 54, Ex. 29, p. 1.)  On March 31, Cobasys indicated that future revised quotations would include the base price, warranty, quantity, and shipping terms that Cobasys preferred—the  "proposal 1" that was discussed in Germany.  Doc. 54, Ex. 3, p. 1; Okonoski Depo., 63-64:19.

One problem with finding that a contract was formed on March 31, 2007, is that MBUSI styled the choice between the two options as a request for an offer.  In his email submitting an updated quotation on April 2, 2007, Okonoski states that MBUSI had "asked to have the updated quotes be provided to DCX by close of business (EST) on 4/2/2007 that reflected

Cobasys' [sic] decision on the two options provided by Mr. Kroeger." (Doc. 54, Ex. 4, p. 1.)  Obviously MBUSI wanted an opportunity to review the final quotation before it committed to a contract.  Simply put, MBUSI wanted to remain the master of the contract and retain control over when an agreement would be created.  This is consistent with MBUSI's failure to issue the Purchase Contract immediately upon confirmation of Cobasys's decision on the two proposals.  If MBUSI believed it had an agreement on March 31, 2007 at the time Cobasys indicated which of the two proposals it intended to include in its updated quotation, it would have immediately issued a purchase order, just as it did following the submission by Cobasys of its April 16, 2007 quotation.  Instead, MBUSI waited seventeen days while the two parties continued to negotiate.

Therefore, even under the totality of the circumstances theory, the earliest date at which the two parties could have entered a contract was April 17, 2007, when MBUSI issued the Purchase Contract. Of course, at that point, we have come full circle and the same reasons for doubt that apply to the Master Terms contract theory plague the totality of the circumstances theory as well.

The Court believes it is more likely than not that MBUSI and Cobasys entered into a contractual agreement.  The Court is also prepared to accept that Cobasys is now attempting to escape from an obligation that it freely accepted.   But MBUSI has failed to meet the high burden required to establish that likelihood of success is clear under the affirmative injunction standard.  The law does not permit, nor should it permit, this Court to order the relief sought by MBUSI prior to a trial on the merits without such a showing.

B.     Balance of Harms.

Far more damaging than the Court's finding on the close question of likelihood of success is MBUSI's inability to show irreparable harm.  The Eleventh Circuit has stated that irreparable harm is "the *sine qua non* of injunctive relief."   *Northeastern Florida Chapter of Ass'n of General Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) *rev'd on standing grounds*, 508 U.S. 656 (1993); *Siegel,* 234 F.3d at 1176.   Even positing for the sake of argument that MBUSI had shown a likelihood of success, it must also show that it will suffer irreparable harm if an injunction does not issue. *See Snook v. Trust Co. of Georgia Bank of*

*Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990) (affirming denial of preliminary injunction even though plaintiff established likelihood of success because plaintiff failed to meet the burden of proving irreparable injury). In order to qualify as irreparable harm, "the injury must be neither remote nor speculative, but actual and imminent." *Northeastern Florida Chapter of Ass'n of General Contractors*, 896 F.2d at 1285. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay" do not reach the actual and imminent standard. *Sampson v. Murray,* 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). The Eleventh Circuit has been willing to accept, however, that a showing of significant loss of customers and goodwill qualifies as an irreparable injury. *BellSouth Telecomms. v. MCImetro Access Transmission Servs.*, 425 F.3d 964, 970 (11th Cir. 2005) (quoting *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)). If MBUSI is able to establish irreparable harm, it must then show that this harm

outweighs whatever harm will be suffered by Cobasys.  *See Northeastern Florida Chapter of Ass'n of General Contractors,* 896 F.2d at 1284-85.

MBUSI claims that absent Cobasys's timely production of a hybrid battery, MBUSI "will be unable to produce the hybrid vehicle in accordance with its scheduled launch date, and will likely be forced to either cancel the vehicle entirely, or delay the launch for an extended period in order to identify and develop a substitute battery, and to redesign other portions of the vehicle to accommodate it."  (Doc. 1, ¶ 40.)  MBUSI claims that this sort of delay or cancellation "will cause serious and incalculable harm to [its] business and reputation."  (Doc. 2,  ¶8.)  MBUSI has provided evidence that, despite its best efforts, obtaining a substitute battery is not technologically feasible without substantially delaying the hybrid project or cancelling it outright.  *See* Armstrong Depo., 128-145 (describing various alternative battery options and why they are either incompatible with the MBUSI hybrid or result in significant delays in its production).  Therefore, in order to show irreparable harm, MBUSI must demonstrate that the harm to its reputation caused by such a delay or cancellation would be significant and would outweigh whatever harm Cobasys would suffer if forced to produce

batteries.  MBUSI attempts to do this by providing deposition testimony from various MBUSI and Daimler officials discussing the harm to Mercedes, and particularly MBUSI, if the hybrid vehicle is not launched on time.  *See, e.g.*, Taylor Depo.,118-201; Waber Depo., 149-150.

While a significant loss of goodwill and reputation could satisfy the *BellSouth Telecomms* requirement if proven, MBUSI does not argue convincingly that losing Cobasys as a supplier will result in this type of damage.  Even if this delay were significant or resulted in the cancellation of the vehicle, MBUSI has only speculated that such a delay or cancellation of this particular project would cause a loss of reputation and customers, supporting that speculation with self-serving statements by MBUSI personnel. In *BellSouth Telecoms,* Bellsouth was able to show that without a preliminary injunction, the company would lose about 3200 customers per week.  425 F.3d at 970.  MBUSI has made no specific showing.  It has provided no expert testimony about the effect on the company if this vehicle fails to launch.  Moreover, the Court notes that hybrid vehicles are already on the market, and have been for some time.  MBUSI is not in danger of losing the competitive advantage that comes with being the first company

with a new product.  Therefore, MBUSI must somehow establish that while the absence of a hybrid up to this point has not resulted in dire harm to the company, if the Court does not immediately order Cobasys to produce batteries for this vehicle, such actual and imminent harm will ensue.  MBUSI has not established sufficient evidence on which to base a finding of irreparable harm without this Court resorting to mere speculation.   While it may be true that MBUSI will lose a significant investment if the hybrid project is not completed, such damage can be compensated monetarily, the type of damage that by definition is not irreparable.[14]

    C.    Public Interest.

    Finally, before a preliminary injunction may issue, the moving party must show that "an injunction would not disserve the public interest."  *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008).   As a general matter, the Court does not believe that requiring Cobasys to comply with its freely-agreed-to-contract would disserve the

---

[14] The court does not find MBUSI's claims of irreparable harm convincing. However, if MBUSI were able to show irreparable harm, that harm would almost certainly outweigh the even more speculative claims made by Cobasys that if it were required to honor its bargain, grievous injury and bankruptcy would result.

public interest.  But the Court must still look to what judicially enforcing that freely-agreed-to-contract would entail.

The Court can certainly imagine situations in which granting a preliminary injunction to MBUSI would not be problematic for the judiciary. If, for instance, there were 5,000 hybrid batteries sitting in a Cobasys warehouse, the Court would then be considering a typical preliminary injunction, ordering Cobasys not to dispose of those batteries until the conclusion of the contract dispute.  In the case of an affirmative injunction, the Court might order Cobasys to deliver those batteries to MBUSI, with an adequate bond in place in case Cobasys eventually prevailed.  But here, not only are there no batteries, but there are no production-ready facilities. Here, MBUSI requests this Court to order Cobasys to begin preparations for and to ultimately produce batteries.  MBUSI's request could possibly have this Court as arbiter over final production designs, specification disagreements, component part cost issues, vender disagreements, personnel issues, and all the other involved and complex questions that one would expect will plague the final stages of a development and production arrangement between two companies engaged in a bitterly contested

lawsuit.  It would clearly disserve the public for this Court to attempt to grant this type of relief.  *See Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 n.3 (5th Cir. 1979) ("Difficulty of enforcement is, in itself, often a sufficient reason for denying injunctive relief. The Court should not be called upon to weld together two business entities which have shown a propensity for disagreement, friction, and even adverse litigation.").

It is "a settled principle that a court of equity will ordinarily decree specific performance only when it can dispose of the matter in controversy by a decree capable of present performance.  It will not decree a party to perform a continuous duty extending over a series of years . . . ." *Arizona Edison Co. v. Southern Sierras Power Co.*, 17 F.2d 739, 740 (9th Cir. 1927) (citations omitted).  The facts of the cases cited by MBUSI actually support this conclusion.   In *Key Safety Systems v. Invista, S.A.R.L.*; *Zurn Constructors, Inc. v. B.F. Goodrich Co.*; *Kaiser Trading Co. v. Associated Metals & Minerals Corp.*; and *Eastern Airlines, Inc. v. Gulf Oil Corp.*, the court ordered the defendants to continue supplying materials as they had been doing under previous contracts.  2008 U.S. Dist. Lexis 70117 *38 ( E.D. Mich. Sept. 16, 2008); 685 F. Supp. 1172, 1185-87 (D. Kan. 1988); 321 F.

Supp. 923, 932-33 (N.D. Cal. 1970); 415 F. Supp. 429, 442-43 (S.D. Fla. 1975).  The relief granted in these cases is not comparable to that which MBUSI seeks.  The Court cannot simply order Cobasys to divert part of its existing production for the use of MBUSI.  It cannot tell Cobasys to allocate a certain amount of its supply for the use in the MBUSI hybrid vehicle.  It cannot even order Cobasys to churn out an additional 5,000 batteries.  If a hybrid battery is ever to be produced, it will require the cooperation of the parties for many years into the future.  *See* Armstrong Depo., 254:7-255:9. MBUSI has argued that it has procedures in the Master Terms and elsewhere to deal with disputes and conflicts that arrise with its suppliers.  *Id.* at 256:2-8.  The Court is well aware of those procedures and how they are used to govern the various aspects of contracts with MBUSI.  Those procedures, however, are premised on the desire of two willing parties to make their contract a success.  MBUSI and Cobasys are clearly not in that posture.  It is evident that these two parties will likely continue to disagree about every aspect of development and production, arguments that would certainly affect the production of batteries in a material way.  Those disputes would undoubtedly make their way to this Court for resolution.  The job of

contract manager is "inappropriate to the functions of the court, which is as ill-calculated to do this as it is to supervise and enforce a contract for building a house or building a railroad, both of which have in this country been declared to be outside of its proper functions, and not within its powers of specific performance." *Texas & P. R. Co. v. Marshall*, 136 U.S. 393, 406 (1890); *see also*, *Marble Co. v. Ripley*, 77 U.S. 339, 358-59 (1870) (noting that the Court was not able to supervise a marble quarry because "[i]f performance be decreed, the case must remain in court forever, and the court to the end of time may be called upon to determine, not only whether the prescribed quantity of marble has been delivered, but whether every block was from the right place, whether it was sound, whether it was of suitable size, or Shape, or proportion."); *Kennon v. Brooks-Scanlon Co.*, 184 F. 988, 988 (5th Cir. 1911) (finding that even if specific performance were a remedy within the discretion of a court of equity, "it should be refused," partly because "it can only be enforced by a mandatory injunction covering a term of years").   Given the weight of these long-standing precedents, this Court cannot be expected to issue an injunction

commanding Cobasys to specifically perform a contract to produce hybrid batteries for MBUSI.

V.      Conclusion.

MBUSI has failed to demonstrate the required likelihood of success on the merits, it has not demonstrated irreparable harm, and the issuance of a preliminary injunction requiring specific performance in this matter is against the public interest.  For the reasons stated above, MBUSI's Motion for a Preliminary Injunction and Cobasys's Motion to Transfer Venue are due to be DENIED.  A separate order in conformity with this opinion will be entered.

Done this 31st day of March 2009.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
153671